The next case. Council, please proceed to your tables. Number 21-2283, Moll Chevrolet v. General Motors Inc. And take whatever time you need to get settled. Mr. Tim Busey, whenever you're ready. Good afternoon, Your Honors. First of all, I'd like to thank you for your indulgence in the scheduling issue that occurred previously, I guess last month. My name is William, may it please the Court. My name is William M. Tim Busey. I'm here with Jonathan Triantos of Brown and Connery, and we represent Moll Chevrolet and Charles Falk in the matter now before the Court. At the outset, I respectfully request that three minutes be reserved for rebuttal. Granted. Pursuant to the Court's third correspondence, I'm prepared to first address the questions of whether Moll Chevrolet dealership or Charles Falk, the dealer operator, is the franchisee and whether this case should be certified to the Supreme Court of New Jersey. As to who is the franchisee, we need to look at this through the lens of the statute itself, which is protective of the franchisees in New Jersey. It's to level the playing field. And when we look at the statute through that lens... Is your complaint called Moll Chevrolet, the franchisee? It did, Your Honor. The complaint it did, but that's a form over substance argument. Well, that's the case counsel. I mean, how are you here if you're not the franchisee? Well, how... Moll is the plaintiff in this case, but in fact, the law protects Moll and Charles Falk. So your argument is Moll is here raising Charles Falk's rights, but not its own rights because it's not the franchisee? What we're saying is, Judge, that under the law and under the purpose of the law is that Moll and Charles Falk are one and the same. Because, and it's important, that Moll, who has been a dealer operator since 1986 and signed the dealer sales and service agreement certifying that he holds at least a 15% unencumbered personal ownership interest in Moll, that is a personal services contract that requires Charles Falk's services. It's dependent on his services, but it's not a personal services contract with him. For all intents and purposes, it is. By the very language of the contract itself, the contract would not exist and Moll would not continue to have a relationship with GM unless Charles Falk... No, it is dependent on his services. I get that, but it's not a contract with him as franchisee. You pleaded Moll and GM entered into the dealer sales and service agreement. We did. Okay. We did plead that. But this personal services contract creates the type of relationship that the New Jersey Franchise Practices Act intends to protect. We're sitting in diversity. We have to ask how New Jersey courts would interpret this. Do New Jersey courts frequently ignore the text when they're concerned about the purpose of the act or its consequences? Well, I can't speak entirely for New Jersey courts, Your Honor, but I will say that New Jersey courts have not addressed this issue in the context of a motor vehicle franchise. But shouldn't we stick close to the text of the statute as opposed to speculating about its purposes or consequences? If you're going to stick close to the text of the statute, Your Honor, respectfully, there are portions of the statute that are important to note. While the New Jersey Franchise Practices Act does not address dealer or dealer operator, it does address franchise and franchisee. And when it goes to the definitions of franchisee, it defines a motor vehicle franchisee as a person who, to whom a franchise is granted and who holds a valid, current valid motor vehicle dealer's license issued pursuant to 39-10-19. I mean, if you want to make another point, that's fine. But I do want to make sure you get to some other points in your presentation as well. Certainly, Your Honor. That statute, the licensure statute, requires a person to be fingerprinted and a person to submit and consent to a criminal background check. That cannot be mall Chevrolet. Understood. That cannot be mall Chevrolet. And the statute that interprets, the case that interprets that statute, in particular the licensure statute, says, corporate form may be looked through to ascertain if the person is qualified. Let's move on to good cause. I want to talk about Amarada Hess. When I read that, it explained the Franchise Act's substantial compliance standard reflects this old equitable doctrine that seems to be excused only for minor unintentional breaches, that you have to both substantially comply and do it in good faith. Is that not the best reading of Amarada Hess and the substantial compliance standard? Well, Your Honor, I think that New AC is the most recent and relevant case, particularly as to motor vehicle franchises. And with regard to that case in particular, the New AC case, this Court had asked or had recognized that the New Jersey Supreme Court had not addressed this issue of good faith in the context of good cause. And, in fact, seemed to have invited the New Jersey Supreme Court to render opinions on this issue with regard to New Jersey franchise practices. It hasn't, but we have to predict. And is there anything better for predicting what they would do from the state court beyond Amarada Hess? Well, I think New AC provides the standard to make the prediction, Your Honor. And New AC, in the court in New AC, while it did not address who the franchisee is under the statute, it did talk about the good cause requirement superseding the termination at will of private franchise agreements. And that this statute was enacted in large part to counteract the unequal bargaining power between the franchisor and the franchisee. But bargaining power is different than substantial compliance. Well, I mean, at one level, the statute seems to say, once you get a deal, once you have an agreement, we're going to look for compliance, substantial compliance. That's maybe all we're going to look for if we just look at the statute. And so then it seems to me that it's really your second argument where the action is, is, is there a dispute of fact as to whether or not there was substantial compliance? Without a doubt. And this is where it was, Judge. Specifically, GM is required by the statute to set forth its reasons for the termination. The purpose of that is to give the franchise E the opportunity to answer and rebut those issues. GM said that the audit, the audit and the completion of the audit is the basis for its termination. Not once in the court below has the audit been determined to be true or false. What has been determined in the court below, that on one motion for summary judgment, there were genuine issues of material fact existing with the audit. And on the other motion filed by GM, there were no issues. Let me ask you about that. Was Mall Chevrolet defrauded? Were there some false repairs that were done, but you're the victim here? If in fact false repairs were proven to have been done by... Were they done? Have you conceded that? Have we conceded that they were done? That there were some false things done here that you're disavowing. For the purpose of the motion, there certainly was one vehicle for certain that there was not substantiate good cause based on a pattern of practice of GM. But that's not what they presented here. They presented claims that they asserted were fraudulent. If in fact they were fraudulent, and it was determined to be such, and Mall Chevrolet had to reimburse GM for that money, GM, Mall Chevrolet certainly would have been at a loss. So your argument is one, you know, one, what is it, one swallow does not a summer make. But if there were three or four swallows, if there were several cases of fraud, that would be enough for them to terminate. That's a question of fact, Judge. That's a question of fact as to whether or not it occurred. Now we don't have any determination of the debit report. But I thought that GM's argument against you was there's, we seem to find out that there's incidents that we believe that there might be fraud. They identified a number of those. They said you're obligated to respond to our request. That's part of the agreement. We got responses from you. They didn't give us everything we wanted. Because you didn't give us everything we wanted. Regardless of whether there's actual fraud or not, you're in violation of the agreement, not in substantial compliance with the agreement, because we asked you about a bunch of fraud. Your response wasn't sufficient for us. We asked you what internal controls you're going to improve. You were silent on that. But under your agreement, you promised that you would provide us with information upon request. You did not do so. Judge, that's exactly the Hobson's choice, that a dealer operator is placed and needs to be adjusted in the playing field by the act. Now, in that case, in that situation, if in fact there is a dispute over the chargebacks, either they go to mediation or they get it resolved in the litigation. That dispute in the chargebacks has never been reviewed or determined to be verified or found to be true in any case in this case. Because there's never been a determination as to whether or not those items identified in the audit report were true or false. By a trier of fact, I assume you're saying. By a trier of fact. I mean, if GM simply wants to say, we don't believe your response, that you fired the service technician, that you fired the service of the... That's circular counsel. I just want to make sure I understand the argument. The argument is, here's the evidence that shows that there was substantial noncompliance. Your response is to say, well, we disagree, and as a result of that, we get to go to a  Is that enough to just say you disagree? We disagree. GM then has to set forth, pursuant to the statute, the reasons for the termination. They are limited to those reasons under the Act, Section 330 of the Act, to those reasons articulated in the termination letter, in a complaint or the action that follows with regard to the termination. Counsel. Yes. This is the amicus brief by the New Jersey Chamber of Commerce. Yes. But it's not really by the New Jersey Chamber of Commerce. You drafted it in part. In part, Judge. We provided information to that... It says more than you provided information. It says you drafted it in part. We did, Your Honor. That's a very bad look. You can't use someone else's brief to circumvent our court's page and word limits without a motion. Your Honor, without due respect, the... The appropriate response is, I'm sorry, Your Honor, I won't do that again. I'm sorry, Your Honor, I won't do that again. Thank you. Your time is up. Time for appellees. May it please the Court, I'm James McGrath for General Motors. The record in this case established that in a little over a year, Maul submitted almost a hundred false warranty claims to General Motors and received thousands of dollars of payments in response. How can the record establish that? We get down to 186 vehicles, because the 517 in the letter aren't all distinct vehicles. There are 186-something that are supposedly false repairs. But for each of those, Maul Chevrolet provided its own document, not a litigation affidavit, a contemporaneous, supposedly contemporaneous document that says it was here and repaired. And then you have Carvana or someone else the other side saying, no, this was somewhere else. So we have a battle of apparently or supposedly contemporaneous business records. That is the definition of the kind of thing that has to survive summary judgment and go to a jury to decide, were these forged or are these real? There was no basis in this case to accept Maul's records as business records. Why? Because they didn't put together an evidentiary basis to do that. We had no affidavit from the dealer operator, Mr. Folk. We had no affidavit from Mr. Colander. These were attached to affidavits by various employees who said, here's the repair records we have for these vehicles and that vehicle. So why isn't that enough to survive summary judgment? Because the repair, first of all, they were never attached to affidavits. They were submitted with a letter to General Motors and then submitted with an affidavit of counsel. There was nothing to it. Okay, let's focus. We have to focus on this litigation, right? Yes. You've got the burden of proof and you have to meet some statutory requirements in court, whatever happened in the letters before. Sure. So when we get to court, we're not looking at 517 anymore. We're looking at 180 something. Sure. And the GM had the burden in this case. So what it had to do was proffer admissible evidence to the district court to establish that it had good cause to terminate. And it had a litany of evidence. It had objective good cause, not just you had a reasonable belief you had good cause. Correct. Objective good cause, which this court has said is the standard in new AC. And what did it present to the district court? It presented all the material it generated prior to the issuance of the notice of default and the notice of termination, including the that vehicles presence couldn't be substantiated at the dealership. GM's audit supervisor... But you've got documents on your side. Correct. Why don't the repair records that they submitted suffice to counter those? Because they would have to be authenticated under the rules of evidence as reliable business records. They never did that. They never put in an affidavit that said these were prepared in the ordinary course of business, as Carvana and CarMax and DriveTime did with their records. MAHL had records with no customer signatures on them. The service management that claimed that they authorized those repairs admitted that they rubber stamped them without ever confirming that the vehicles were actually present at the dealership. There was objective evidence, Your Honor, that those vehicles were not there, and MAHL couldn't do anything to rebut that. The business records, the repair order documentation, lacked the level of trustworthiness that would have allowed the district court... Isn't that trustworthiness a matter for the jury, whether the signature matters or not? It's an evidentiary issue, and MAHL never presented them to the district court as business records and allowed the district court to make that finding. If they were authentic hearsay exception business records rules, right? If they were, you'd then admit that this is a question for a jury trial, or would you fall back on some other basis for good cause? I don't think, first of all, I don't think those in and of themselves would be sufficient, given all the frailties with the records. Even if they were admitted as MAHL's business records... So you'd be saying that there was a dispute, but not a genuine dispute, this is more scintilla? Correct. Okay. But let's say it was more than a scintilla. So we'll get two ifs here, right? So if they're So MAHL admits that one of the repairs was false. The Michael Grace repair they admit was false. What? What if we think you need a pattern? Even a few, they'd only admit more than one. Sure. Well, to Judge Stipp's point, MAHL was presented with this evidence by General Motors. It could have gone straight to a notice of termination under Article 14 without any opportunity for MAHL to respond. They chose to allow MAHL to respond. And they provided... Michael Grace was called out as a specific example, together with two other examples that were out of state at the time MAHL claimed to repair them. And what did MAHL do? MAHL claimed we didn't respond to those, even though they admit now that Michael Grace was easily identifiable as fraudulent. They deny GM had any evidence of misconduct. They accuse GM of bad faith. And they have denied that to this day. That goes to the fundamental aspect of the franchise relationship. So basically what you're saying is we can put all of that to the side. And we can just say that GM asked you for, in response to their first letter, they asked you for certain information. The information that MAHL gave back to GM, you think, didn't meet the standards for what you want. Let me just make sure I know where that standard comes from. It might be, you know, I hope you know the agreement better than I do, but it might be Section 13.1, which basically says, if notified, dealer will be given the opportunity to respond within 30 days of receipt of the notice, explaining or correcting the situation to General Motors' satisfaction. So at one level, if we just take that literally true, that seems to really, really cut in your favor, right? Because you say, I can do whatever, GM can do whatever we want, but we can evaluate the sufficiency of your response. And if we don't like it, now we have good cause. The flip side is your friend on the other side said, wow, the whole point of this statute is to equalize bargaining power and not give one person kind of unilateral ability to say your response isn't good enough. Two responses there. GM, you're right, GM proceeded both under Article 13.1 and under any opportunity. And we think under both approaches, we win. But the statutes, the legislature's decision with respect to unequal bargaining power was simply to outlaw at-will terminations. And the New Jersey Supreme Court said this in Middletown Donut. It said the good cause statutes are designed to have limited reach, and it's only where a franchisee is in material compliance with its agreement that you can't terminate. But where you have a franchisee that has violated the terms of the agreement, it doesn't get protections of the act. You have good cause to terminate. And that's basically how the bargaining power was addressed by the legislature. Before you can terminate, you need to show that there's a material breach of the agreement. This court said that 20 years ago, and it relied on Amaretta Hess when it set the standard. If you look at the new AC decision, Amaretta standard has basically looked at the good cause standard, the substantial noncompliance standard, and basically determined it was a material breach. So can I just back up to 13.1? Sure. What I've heard from you is that you've said that what the statute does is it puts us in good cause space, not at-will space. Correct. I've heard it. But then the last part of 13.1 says, explaining or correcting the situation to General Motors' satisfaction. And when you give something just to the satisfaction of one party, that begins to feel maybe a touch more like at-will than for cause, because at-will is just the employer can do whatever it wants to its own satisfaction. So I guess what I'm wondering is how does 13.1, I mean, is 13.1 consistent with the statute that seems to say for cause, when it basically writes in at-will? General Motors didn't terminate because Maul's explanation wasn't satisfactory. It terminated because the undisputed evidence that it had at the time and later developed demonstrated that there were false submissions. And so now we're back to the underlying evidence. And if we're back to the underlying evidence, it would seem that if there's any dispute there, that goes to a jury. That's true. But the district court went carefully through this record. And Maul never proffered its documents as business records and never offered any other evidence that demonstrated the vehicles were actually at the dealership. Did GM object to the consideration of those exhibits at summary judgment? Well, GM never, Maul never proffered them as business records. GM argued in its briefs that those records had no reliability. And Maul didn't argue, and the district court therefore didn't have to consider them as business records. They were patently untrustworthy given the lack of any signatures and the service management's... I find that some of these are in pen. They're not typed. That's not a material, that's a minor breach, but that's not a material breach. And that's the kind of thing that goes to weight, not admissibility. Sure. And to be clear, we're differentiating between those record keeping violations, which went to the charge back claim. You can't terminate based on pen versus type. Correct. And we're not arguing that, Your evidence in this case demonstrated that nearly a hundred vehicles were never at Maul when it claimed to repair them. And there is not a genuine issue of material fact as to those issues. I'm just putting your friends on notice. When they're back up on rebuttal, I'd like to hear about the response to this business records issue, whether, in fact, there was enough before the district court that it should have treated them as business records sufficient to raise a genuine question. Sure. And Maul, if you look at their summary judgment papers before the district court, never made this argument. The only thing Maul really made in its summary judgment papers was an argument that the affidavits shouldn't be considered because they were late. They were after the notice of termination, which the district court correctly rejected. They argued that the credibility of those affidavits, which was in question, which this court has rejected that is sufficient to overcome summary judgment. And then they raised some issues with respect to the drive time affidavit as to the location of the vehicles. But the district court looked at the record and found that none of those issues were genuine disputes. Those are the only, and then during the oral argument at summary judgment, Maul raised two other issues with respect to Ray Moffitt, the service advisor, saying there were keys there, but so he assumed the vehicles were totally speculative. And the service dispatcher, Lenny Yakimo, it's his testimony that he vaguely recalled one vehicle. And the district court properly rejected those as not raising any genuine disputes. So I'm sorry, but I just want to get back to 13.1 because it seems that you could have avoided all of these questions of factual dispute if you just said we asked you to give us a letter about what your updated internal controls are. You didn't. Internal controls are everything in the fraud ballpark. They're everything. You didn't give us any response. We can't trust you anymore because you didn't tell us what your internal controls were. And we've got to let you go on that basis. That is an undisputed, that's undisputed had you decided to go down that road because that doesn't rely on whether the vehicle was there, who had the keys that day, who didn't have the keys that day, what Carvana says. None of that matters. But the reason that you're not relying on that seems to be that you think that that takes it into an at-will relationship? No, Your Honor, no. And if you look at our notice of termination, it's both grounds. I don't, Maul, GM terminated based both on the fact that there were false submissions. And it also That's your Article 14. Correct. And then you have this Article 13, you didn't respond. But it also put in the notice of termination, we gave you an opportunity to respond and you didn't respond satisfactorily. In fact, you didn't even respond to the specific examples we called out, one of which you've now conceded was patently false. So if, so I guess what you're saying is if Section 13.1 is licit under the New Jersey Franchise Statute, then that's your basis. But it may not be licit because it may do away with the for-cause requirement and transform it into an at-will requirement because it is solely on General Motors' satisfaction, which sounds a lot like at-will. Well, no, I don't want to concede that, Your Honor. No, no, no, no, I don't want to concede that. There's no tap here, I'm just trying to understand. Yeah, I don't want to concede that. There is a, you know, the New Jersey Franchise Statute says, you know, was there a material breach of the dealer agreement? Here there were material breaches both of 14.1 because there were false submissions and there was also a failure to undisputed, if we just look at the Michael Grace example that was called out, which adds an independent basis under Section, Article 13 for that termination. So as long as you are following the agreement, the New Jersey legislature has said if Maul has materially breached those provisions and they're identified in the Notice of Termination, that's good cause to terminate. And that's, you know, clearly we think there's an undisputed record here that supports the false submissions. And that the submissions by Maul at summary judgment were not sufficient. And Maul never made a business record argument for the district court to consider and decide. That's a gatekeeping role that the district court plays as to whether or not those have reliability. So I get that, but, you know, usually the admission of evidence, I mean, evidence at trial is kind of a practitioner's trap. Because you put evidence in and some people authenticate it, some people object to hearsay, some people don't. In a way, it's just very different than if that same evidence were admitted at trial. And so the question is, it feels like a trap for everyone. And so the question is, was Maul under the obligation to do everything that would normally be required to do at trial to admit it? Or was GM under the obligation to object to the admission of this evidence once Maul submitted it in its briefing? I mean, there was a lot of attention paid to the affidavits that we submitted from CarMax and Carvana and DriveTime in the supporting depositions. And those authenticated those documents as business records. And there was a lot of opportunity for Maul to address the admissibility of that. And Rule 56 says, you as a party have to proffer admissible evidence. So you have to create an evidentiary burden. And, you know, maybe a trial, like, it gets looked at a little more closely, but it has to be admissible at summary judgment. That's the purpose. Maul didn't do any of that. It didn't offer any affidavit other than the damages affidavit of Mr. Folk that was stricken. Maul did not try to authenticate those documents as business records and say, look, this proves that car was here. In fact, when its service management, Mr. Yakumo, at his deposition looked at these records, he basically couldn't attest one way or another as to whether those documents were here. And he signed them as to whether those vehicles were there. And he signed them. And so because this case involves allegations of fraud, you say that authenticity comes to the fore. Critical. Critical at summary judgment. And without that evidentiary record, Maul failed to meet its burden to rebut GM's position. Thank you. Oh, I'm sorry. Who is the franchisee here? Because this seems to be an elusive question that I find hard to understand why it's this difficult. You say Maul. They say not. No one seems to be able to put forth the motor vehicle license. Can you provide some guidance? I mean, I think the complaint, the language of the Franchise Act and the dealer agreement are clear that Maul is the franchisee. And this was an argument that came up at summary judgment after Maul was faced with this evidentiary record. If you look at the complaint, Maul is the named plaintiff. Maul is mentioned in the complaint 400 times. Sure, but that doesn't tell us anything. They could be the wrong plaintiff, right? They make six specific allegations in the complaint. Don't they need the motor vehicle license? My understanding is the franchisee has to have a motor vehicle license. And I'm assuming you agree Maul does not hold a motor vehicle license. Section 56.10.16 says the franchisee is the person or entity to whom a franchise is granted by a motor vehicle franchisor. Doesn't say anything about a license. Then that same provision says the franchise is the written agreement between the parties, which is the dealer agreement. But you can't have a motor vehicle dealership without the motor vehicle license. So I understand that one statute doesn't speak to it, but another provision does, which is what creates the tension here, right? Sure, but for purposes of the good cause standard under the Act and determining who's the franchisee, you look at the 56.10.16, which is what governs 56.10.5, the good cause provision. The motor vehicle license is an individual has to apply for that, but it's issued in the name of Maul Chevrolet. And here the statute is clear that Maul is the franchisee and the plaintiff submitted and the definition looks at the dealer agreement. And the dealer agreement is clear. Maul is the dealer. Article 2 makes clear that the dealer Maul is the only party of this franchise agreement. And Article 17.9 makes clear there's no third party beneficiary. So I think the license is a little bit of a red herring. If you look at the definitions in 56.10.16, which are the provisions that govern motor vehicle franchises. Do you recall if the allegations, I think there's about four of them, in the complaint that say Maul is the franchisee, they're like the first paragraph under count one, the first paragraph under maybe count two. I don't have it in front of me. But do you recall if you admitted or denied those in the answer? So we responded, there were six separate allegations. And we responded that those were legal conclusions which no response is required. But we then went on to deny them because they referenced two different sections of the franchise statute. Both 56.10-3, which is the provision that applies generally to franchises. But also to 56.10-16, which is the specific one for motor vehicle franchises. So we think they're legal conclusions, but as technically alleged, they weren't correct because they... So at one level you could have maybe just avoided this if you would have said we admit that Maul is the franchisee, we've got other issues. We admit that people have their own crafting of an answer, but you didn't admit that. Our admission though is irrelevant to whether it's judicial admission against Maul for making that allegation. Once Maul made that allegation six times in its complaint, that's a judicial admission against him as a plaintiff. It is a plaintiff. It's binding on it in this case. I mean, Mr. Folk is not here as a plaintiff. We've been litigating this case against Maul Chevrolet for five years. I mean, is Mr. Folk going to take the benefit of the corporate form but not the burdens? Is he going to be liable for the charge back if it ultimately goes through? Does he pay taxes individually? I mean, this is a slippery slope that finds no basis in the statute of the case law from the New Jersey Supreme Court or the Franchise Practices Act. I see I'm well over my time. Thank you. Mr. Tembusi, I believe you have three minutes, and I'd like to hear you at some point address this business records issue as well as Mr. Akimowitz and whether your evidence in fact created a genuine issue of material fact. Yes. Yes, Your Honor. I'll address that first, and I want to go to Judge Mady's issue with regard to the franchisee very briefly. Judge, the 30B6 witness authenticated the documents, the records, the repair records. The Maul employees authenticated the documents. The documents were part of the response. The job tickets were part of the response to the termination notice, which was sent by Maul to GM. That was certified, too, by counsel as part of the summary judgment record as business records of Maul. Now, with that all being said, those records were judged by a summary judgment standard. We are not seeking to admit those records. We are not seeking at that time to issue the affidavits of Carvana, DriveTime, and CarMax, all of which were under vigorous dispute, all of which raised genuine questions of material fact. Now, I briefly judge Mady with regard to the franchisee issue. GM, GM's regional director of Chevrolet sales and service, the person who made the decision to terminate the franchise, testified under oath, Charles Falk is the only one we are beholden to, and he is also beholden to us. Tim Turby, GM's global vice president for customer care and after sales, said, Falk is the dealer and has complete responsibility. GM treated Charles Falk as the person. Now, if this ruling is allowed to stand, in this case, in spite of the New Jersey Franchise Practices Act, a service technician and a service advisor who submitted documentation that could ultimately be found to be false and fraudulent would be the reason for the termination of Mr. Falk's franchise. That can't be what the New Jersey legislature intended when it wrote the statute to protect New Jersey franchises. Is that true? I do want to be sure to hear your answer on Mr. Yakimowitz. Did he, in fact, admit that he didn't have, you know, as counsel on the other side said, he couldn't really dispute these things, didn't really know about them? Is that inaccurate? Mr. Yakimowitz testified under oath that he believed that one of the vehicles that was attached to one of the affidavits was a vehicle that he repaired, and he used it as a teaching device for other people there. Judge, if I may, I realize my time's up. There's one point that I think is critically important when it comes to whether or not this issue, this court should consider certifying it to the Supreme Court. Dunkin' Donuts versus Middletown deals with what happens when an owner, or a principal in a franchise, commits acts, knowing and deliberate acts, in violation of the franchise agreement. No New Jersey court has addressed that we're aware of, but certainly no New Jersey court that renders precedential opinions has issued an opinion in a converse. What happens when the dealer operator, the person who has to be there in order for the franchise to exist, does not know of actions of low-level rogue employees? Would it be fair under those circumstances and consistent with the act that that person would have to pay all of the chargebacks back without having any of them heard or evaluated to be true or false and lose his franchise? That can't be what the act was intended to protect or what the result intended by the act. Thank you, Your Honor. Thank you for your rebuttal. We'll take a matter under advisement.